IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

**UNITED STATES OF AMERICA,**

**EX REL. FAMILY CLINIC OF NEW ALBANY, INC., BRITTANY MARTINEZ-CLARK AND TRENT CLARK, RELATORS**                 **PLAINTIFFS**

**VS.**                 **CIVIL ACTION NO.: 3:21-CV-139-GHD-JMV**

**CHARTSPAN MEDICAL TECHNOLOGIES, INC.**                 **DEFENDANT**

## ORDER DENYING MOTION TO COMPEL

This matter is before the Court on Defendant's motion to permit the further deposition of Plaintiff Brittany Martinez-Clark and for an order compelling her to answer questions regarding the allegations of the Complaint [Doc. 77]. For the reasons below, the motion is without merit and is denied.

Plaintiffs Family Clinic of New Albany, Inc. ("Family Clinic"), Brittany Martinez-Clark, and Trent Clark filed this matter on June 22, 2021 [Dkt. No. 3] alleging that Defendant ChartSpan Medical Technologies, Inc. ("Chartspan") violated the federal False Claims Act ("FCA") and federal Anti-Kickback Statute ("AKS") related to its provision of chronic care management ("CCM") services on behalf of the Plaintiffs. Ms. Martinez-Clark is a nurse practitioner and the majority owner of Family Clinic. *See* [Doc. 77] – Ex. A at ¶¶ 7:3-4; 46:9-11.

On January 27, 2025, a Case Management Conference was held, and the following deadlines, of relevance here, were set: discovery was to be completed by January 27, 2026, dispositive and Daubert motions were due by March 30, 2026, and the trial was scheduled to begin on September 28, 2026. [Doc. 58].

Defendant deposed Martinez-Clark on December 12, 2025. [Doc. 78] at 3. According to defense counsel, at several points in the deposition, Plaintiffs' counsel objected to his deposition questions and directed Plaintiff not to answer questions based on attorney-client privilege. This, according to defense counsel, prompted him during the deposition to state: "Just for purposes of the record -- and we can talk about that off, if that's more appropriate -- in light of the number of objections particularly based -- concerned about privilege, I'm just kind of letting you know that I'll probably ask to keep the deposition open at the end of the day, in the event that I need to seek any kind of evaluation of that" – *See* [Doc. 77] – Ex. A, at ¶¶ 181:16-24. At the close of the deposition, the following exchange occurred between counsel, "MR. WESTLING: As with the prior objection, we'll keep it open, just for the purposes we discussed." "MR. PIGOTT: Totally agreeable." *See* [Doc. 77] – Ex. A, at ¶¶ 217:3-5.

One month later, on January 13, 2026, Defendant's counsel identified, by letter, the objections he found improper, and enclosed relevant excerpts of deposition testimony. *See* [Doc. 77] – Ex. B. Plaintiffs' counsel responded on January 22, 2026. *See* [Doc. 77] - Ex. C. The letter exchange did not resolve the matter, and this motion followed on January 27, 2026, the final day of discovery.[1]

As noted above, in the instant motion and supporting memorandum, the Defendant asserts that at Martinez-Clark's deposition, her counsel repeatedly objected to defense counsel's questions inquiring about the basis of the allegations in the complaint, asserting attorney-client privilege and instructing his client not to answer. These objections were, according to defense counsel, improper

---

[1] At the parties' request, the undersigned extended discovery on February 3, 2026, for the limited purpose of completing expert depositions by February 27, 2026. The motion seeking such extension did not mention any need to depose or continue the deposition of any other witness beyond the new discovery deadline. In fact, the Defendant represented in the motion seeking the extension that it sought "solely" to extend the discovery deadline from January 27, 2026, to February 27, 2026, "for the limited purpose of completing expert depositions, *with no other discovery requests to be propounded or pursued during this period.*" (emphasis added) [Doc. 76].

in two respects. First, the questions did not seek to inquire into attorney-client privileged information, but instead sought Plaintiff's personal knowledge of the facts underlying her allegations in the complaint and her understanding of those allegations. Second, the objections were improper speaking objections designed to prevent the Plaintiff from answering otherwise proper questions.

**Legal Standards**

Federal Rule of Civil Procedure 37 authorizes the Court to compel deposition testimony. Fed. R. Civ. P. 37(a). In particular, Rules 37(a)(3)(B)(1), 37(a)(3)(C) and 37(a)(4) state:

> (B) To Compel a Discovery Response. A party seeking discovery may move for an order compelling an answer, designation, production, or inspection. This motion may be made if:
>
>> (i) a deponent fails to answer a question asked under Rule 30 or 31;
>
> (C) *Related to a Deposition.* When taking an oral deposition, the party asking a question may complete or adjourn the examination before moving for an order.
>
> (4) *Evasive or Incomplete Disclosure, Answer, or Response.* For purposes of this subdivision (a), an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond.

Fed. R. Civ. P. 37(a).

When the attorney-client privilege is at issue, as it is here, it is the burden of the party asserting the privilege to establish its applicability. *United States v. Kelly,* 569 F.2d 928, 938 (5th Cir. 1978), *cert. denied*, 439 U.S. 829 (1978). The attorney-client privilege protects communications between a client and counsel, and not the underlying facts. *See Upjohn Co. v. United States,* 449 U.S. 383, 395–396 (1981); *see also Thurmond v. Compaq Computer Corp.,* 198 F.R.D. 475, 479, citing C. Mueller & L. Kirkpatrick, Evidence § 5.12 (2d ed. 1999). A client

"cannot insulate the underlying facts from discovery simply by relating them to counsel." *Thurmond*, 198 F.R.D. at 479. Accordingly, "pre-existing facts that underlie the client's confidential communications are not privileged simply because the client disclosed them to an attorney for the purpose of obtaining legal services." *See Baptist Health v. BancorpSouth Ins. Servs., Inc.*, 270 F.R.D. 268, 276 (N.D. Miss. 2010). Nor does attorney-client privilege cover communication of facts from counsel to the client. *Thurmond*, 198 F.R.D. at 483 ("[T]he attorney-client privilege does not reach facts within the client's knowledge, even if the client learned those facts through communications with counsel."); *see also Henry*, 212 F.R.D. at 90-91 (holding that "the privileges do not protect the client's knowledge of the relevant facts, whether they were learned from counsel or facts learned from an attorney from independent sources.").

Local Rule of Civil Procedure 7(b)(2)(C) states "A party must file a discovery motion sufficiently in advance of the discovery deadline to allow response to the motion, ruling by the court, and time to effectuate the court's order before the discovery deadline."

**<u>Objections at issue</u>**

The specific pages and lines of deposition testimony cited by movant as at issue in the instant motion are 88:15 – 89:2, 142:1-13, 143:3-22, 143:23 – 144:2, 145:3 – 146:9, 148:2-25, 151:1-21, 152:2-23,170:1-19, 181:3-24.[2]

For analysis purposes, I have highlighted the referenced testimony below. For context, I have also included any accompanying testimony in unhighlighted format, including that recited by Plaintiff's counsel in response to the instant motion. Following each issue raised in the instant motion, I have set forth the Court's resolution of the same.

---

[2] Page 170 of the transcript was not actually provided in the parties' exhibits despite being raised as at issue.

**88:15 – 89:2**

```
1      A.  I can't speak to what CMS's
2   expectations are on that.  I can only say that
3   I've never had an opportunity to or an
4   instruction to supervise anyone at ChartSpan.
5      Q.  Right.
6          And that's because that's not required,
7   right?
8      A.  It was not told to me that it was
9   required by ChartSpan.
10     Q.  Do you know it to be required today?
11     A.  I'm not sure what -- I've been
12  terrified of CCM since 2021.  And I have not even
13  looked at current regulations or guidelines on
14  it.
15     Q.  Do you believe it to have been required
16  at the time?
17     A.  That --
18         MR. PIGOTT:  Objection to the extent
19  that her belief now about the application of CMS
20  rules then is now interrelated with her advice
21  from her attorney.
22         So if she -- you can ask the question
23  or if she can frame an answer in which her
24  perception now about the application of the law
25  then is outside of the scope of what she and I
P89
1   have talked about, then she can answer.  I'm
2   sorry to be so complicated, but that's the law.
3          MR. WESTLING:  I'm not interested in
4   going into privilege or anything else that --
5   about your discussions.  So let me try again.
6   See if I do a better job.
7          MR. PIGOTT:  Well, a different job.
8   BY MR. WESTLING:
9      Q.  To the extent that you were aware of
10  what the program required in the time you were
11  dealing with ChartSpan -- so that's what we're
12  talking about, what you knew at that time, not
13  what you've learned since.  Okay?
14     A.  Okay.
15     Q.  Do you understand that?
16         Did you understand that you had to
17  supervise their employees for this service to be
18  appropriate?
```

>      19    A.  No, I did not.  I did not understand
>      20    that I was to supervise their employees
>      21    specifically.

*The Court's resolution:* When viewed in context, there is nothing improper about this answer or the highlighted objection.

**142:1-13**

>    141:1-25
>
>      1    at Page 23 of this document.  And this is the
>      2    certification language.  And I'm pointing now to
>      3    Paragraph Number 4 on this document on Page 23.
>      4          Do you want to take a look at that for
>      5    me?
>      6    A.  Okay.
>      7    Q.  And so this language, which I'm not
>      8    going to read in an act of mercy for the court
>      9    reporter, just generally says that you're
>      10   agreeing to abide by Medicare laws and
>      11   regulations that apply to you, right, and that
>      12   you are going to -- you understand that payment
>      13   of a claim is conditioned upon the claim and
>      14   underlying transaction complying with the law,
>      15   correct?
>      16   A.  Yes.
>      17   Q.  And do you understand that to be the
>      18   agreement that you have with Medicare?
>      19   A.  Yes.
>      20   Q.  So in the complaint filed in this case,
>      21   you allege that ChartSpan's marketing of its CCM
>      22   services, in a manner which allowed the provider,
>      23   in this case Family Clinic, to keep a substantial
>      24   portion of the money it was paid by Medicare for
>      25   the service, violates the Anti-Kickback Statute.
>
>    142:1-13
>      1          Were you aware of that allegation?
>      2          MR. PIGOTT:  Objection.  She's aware
>      3    of the content of the complaint.  I want to
>      4    object to the form of the question to the extent
>      5    that it paraphrases the complaint.  And while
>      6    she can answer the question with respect to
>      7    whether something like that is in the complaint,

```
 8   I'm going to have to instruct her not to answer
 9   as to any question, the content of which would
10   reflect what she understands now as a result of
11   her communications with her lawyer.  Now that
12   we're getting into legal position-taking about
13   that.
14         MR. WESTLING:  Yeah.  Understood.
15   Understood.
16      A.  So the original --
17   BY MR. WESTLING:
18      Q.  Sorry.  Answer if you got it.
19      A.  Not from the beginning.  But the
20   original point of the question is, am I aware of
21   there being --
22      Q.  That you allege in the complaint that
23   you filed against ChartSpan that the way it
24   marketed these services to you and to other
25   providers violated the Anti-Kickback Statute.
```

**143:3-22**

```
 1      A.  I'm aware of there being a portion of
 2   the complaint related to that, yes.
 3      Q.  All right.  Did you take a kickback
 4   from ChartSpan?
 5         MR. PIGOTT:  Objection to the form of
 6   the question.  Same objection in that her
 7   understanding now has to be, substantially, the
 8   result of -- her legal opinion on that has to
 9   be, substantially, the result of her
10   communications with her lawyer about that.  And
11   if she has an opinion about that statute outside
12   of the communications she's had with her lawyer,
13   I would be surprised, but she can answer about
14   it outside of that scope.  But --
15         And a kickback is a term of art in the
16   law.  It's not the simplest of laws.  And she's
17   entitled to have the benefit of her consultation
18   with her lawyer about whether there's been a
19   violation of that as a matter of law.  And she's
20   not obliged to disclose the content of what
21   she's learned from her lawyer about that, so I'm
22   going to instruct her not to answer that.
```

**143:23 – 144:2**

```
143
23   BY MR. WESTLING:
```

```
24        Q.   Okay.  Ms. Clark, when you were
25   negotiating with ChartSpan about engaging their
144
 1   services, were you improperly induced to hire
 2   them because they were willing to let you keep a
 3   portion of the services that you were billing
 4   for?
 5            MR. PIGOTT:  Same objection.  I'm
 6   going to instruct her not to answer that.
 7            MR. WESTLING:  That --
 8            MR. PIGOTT:  "Improper" only has a
 9   meaning with respect to violation of law, and
10   that implicates -- that's inseparable from my
11   communications with her about that very issue.
12   Meaning, it has no impropriety outside of
13   violating any law, and her understanding about
14   the law is inseparable from her communications
15   with me, so I'm going to instruct her not to
16   answer that as to impropriety.
```

**145:3 – 146:9**

```
144
17            MR. WESTLING:  Okay.  I would simply
18   say for the record, I think there's a point in
19   which this is a factual question about what was
20   in her mind at the time and what she intended.
21            I understand --
22            MR. PIGOTT:  Well, that would be a
23   different question.
24            MR. WESTLING:  I understand -- I
25   thought it was the same question, but I'll try
145
 1   again.
 2            MR. PIGOTT:  Okay.  I got you.
 3   BY MR. WESTLING:
 4        Q.   Ms. Clark, when you were negotiating
 5   with ChartSpan to hire their services, did you
 6   believe that you were being offered money to hire
 7   them in a manner that created any concern in your
 8   mind about what you were doing was right or
 9   wrong?
10        A.   I certainly did not -- I don't recall
11   having any thoughts that anything about what we
12   were doing at that time was wrong.
13        Q.   Okay.  So the complaint alleges that
14   bills being submitted based on ChartSpan's
```

15  services for -- to Medicare were fraudulent,
16  correct?
17      A.  The complaint states that; is that what
18  you said?
19      Q.  That's what I'm asking.
20      A.  Yes.
21      Q.  And did you submit fraudulent bills to
22  Medicare?
23          MR. PIGOTT:  Objection.  Same
24  objection.  I'm going to call it "benefit," but
25  I think she's had the benefit of legal counsel

146

1  about the complicated way that the law treats
2  claims in that respect.  And her opinion on that
3  today, if that's what you're asking, is
4  inseparable from the content of her
5  communications with her lawyer.
6          That's just the nature of the claim
7  and the nature of the application of the law to
8  these facts, and I'm going to instruct her not
9  to answer that.
10  BY MR. WESTLING:
11      Q.  So, Ms. Clark, providing an answer only
12  based on what you knew at the time you were
13  dealing with ChartSpan and not since that point,
14  anything you've learned after that.  Start there
15  as far as understanding the nature of my
16  question.  Just temporally, I just want to make
17  sure that we're talking about the right time
18  frame.
19          Do you understand?
20      A.  Yes.
21      Q.  With that information only, did you
22  understand at the time you approved these bills
23  to be sent to Medicare that you were doing
24  something wrong?
25      A.  Initially, no, sir, but as complaints

147

1  from patients continued and further review of
2  those complaints, that's when we first attempted
3  to remove ourselves from the contract because we
4  did not feel that the services were being
5   preformed as they needed to be.
6      Q. And to the extent that you reached that
7  conclusion, what was it based on?
8      A. The content of the care plans, the

9 conversations that were held with our
10 patients by ChartSpan employees, or lack thereof,
11 There was a question of actual time spent.
12 That's three primary examples.
13     Q. Your complaint alleges that the
14 services that ChartSpan provided to you and other
15 clinics led you and other clinics to submit false
16 claims to Medicare, correct?
17     A. Yes
18     Q. And so to the extend that you were paid
19 by Medicare, your complaint alleges that you were
20 paid by Medicare for false claims, correct?
21     A. I'm not sure that I know how to answer
22 that question.
23     Q. Okay. Can you tell me what the problem
24 is?
25     A. I don't understand exactly what the
148
1 question is that you're asking, I suppose.
2     Q. So the way I read the complaint - - and
3 I could be wrong about this - - you allege that
4 claims submitted based on ChartSpan's services
5 were false, correct?
6     A. Correct.
7     Q. So to the extent that Family Clinic
8 submitted claims based on ChartSpan's services,
9 those were false, correct?
10     MR. PIGOTT: I'm going to instruct her
11 not to answer to the extent you're asking her
12 now not about - - asking her now about her
13 opinion or judgment now about the legality of
14 the claims themselves because that's inseparable
15 from her attorney's advice to her on how the
16 law, in a complicated way, address this.
17     MR. WESTLING: Right. So what I'm
18 going to try to do next is ask a question about
19 what the complaint says, which is what I was
20 asking. Since that's her complaint that she
21 verified, she has to be able to answer that
22 questions or this case gets dismissed.
23     MR. PIGOTT: Well, if the questions is
24 about the content of the complaint, I understand that.
149
1     MR. WESTLING: I'll do better
2     MR. PIGOTT: I think she ought to be
3 handed a copy of it. But it is her complaint

4    and it says what it says.
5      MR. WESTLING:
6    But I mean, it's clear - - I think we
7    got through point one, which is that the
8    complaint alleges that services provided by
9    ChartSpan that resulted in bills by various
10   clinics were submitted to Medicare, and those
11   were false claims, correct?
12     MR. PIGOTT: That's what the complaint
13   alleges?
14     MR. WESTLING: That's right.
**15   A. Yes**
16     MR. WESTLING:
17   Q. And a subset of that would be that the
18   claims that Family Clinic submitted based on
19   ChartSpan's services were also false claims,
20   correct?
**21   A. There was concern that that could be**
**22   correct, which is why we began to do our part to**
**23   terminate the contact with the company.**
24   Q. Right.
25   But you, in 2021, I don't remember the
150
1    year, filed a complaint in federal district
2    court, here in the Northern District of
3    Mississippi, where you specifically allege that
4    false claims were submitted by your clinic and
5    other clinics based on the services that
6    ChartSpan provided to you, correct?
**7    A. Yes.**
8    Q. So there's no question that that's your
9    allegation, correct?
**10   A. My answer was in regards to my opinion**
**11   on this matter before I spoke with Brad.**
12   Q. Understood.
13   I'm now asking about what you filed in
14   federal court in which take the position that
15   the complaint - - the claims filed by other
16   providers and Family Clinic, to the extent they
17   were based on ChartSpan's work, were false
18   claims.
**19   A. Yes.**
20   Q. So that's what you're saying today,
21   correct?
**22   A. That's what is contained in the**
**23   complaint. And that's what we're here for.**

24 Q. And that's what you believe is true?
**25 A. Yes**
151
1 Q. So that suggests that you have publicaly
2 taken the position that you received money from
3 false claims that were submitted to the
4 government, correct?
**5 A. Correct.**
6 Q. All right, And to the extent that you
7 received that money, what steps have you taken to
8 pay it back to the government?
**9 A. Any conversiatons regarding advisement**
**10 on that has been held with Brad on how to proceed**
**11 with that. So I'm not sure I'm able to**
**12 answer.**
13 Q. Well, your counsel has not yet
14 instructed you not to answer, so I would ask that
15 you answer unless he does that.
**16 A. Okay.**
17 MR. PIGOTT: Well, her reasons for
18 doing one thing or another, I would instruct her
19 not to answer with respect to that, but as I
20 understand it, you're just asking her what
21 conduct dud she do - -
22  MR. WESTLING: That's correct.
23  MR. PIGOTT: - - in response to a
24 perception that the claims may be unlawful.
25  MR. WESTLING: That's correct.

**152:2-23**

1         MR. PIGOTT:  And she can answer that.
**2         THE WITNESS:  We haven't taken any**
**3  steps towards repayment.**
4  BY MR. WESTLING:
5      Q.  So you still have the money, correct?
**6      A.  Correct.**
7      Q.  And, again, based on your knowledge
8  alone, not what Mr. Pigott has told you in any
9  way, do you understand anything about the law
10  with regard to what duties you have if you
11  received an overpayment from the government?
12          MR. PIGOTT:  Now I instruct --
13          MR. WESTLING:  She's just telling me
14  whether she has any idea or not.  I have no idea
15  if she knows --
16          MR. PIGOTT:  Well, I instruct her not
17  to answer to the extent that that results from

```
18   communications with me about the duties to
19   refund as opposed to filing a lawsuit.  I don't
20   know that she would have any understanding about
21   that apart from her communications with me, but
22   if she does, she can answer.
23        A.   I don't.
24   BY MR. WESTLING:
25        Q.   So you've never taken any kind of
```

*The Court's resolution 142:1-13, 143:3-22, 143:23 – 144:2, 145:3 – 146:9, 148:2-25, 151:1-21, 152:2-23, 170:1-19*: When viewed in context, there is nothing improper about this series of answers or the highlighted objections, albeit the privilege objections were in some instances so explanatory as to rise to the brink of suggestive. However, they are not of such a nature as to warrant reopening a deposition after the discovery deadline has run.

**181:3-24**

```
 1   practitioners?
 2        A.   Yes.
 3        Q.   But as a practical matter, you don't
 4   know whether or not that definition is broad
 5   enough to include certain nonlicensed personnel,
 6   correct?
 7            MR. PIGOTT:  Objection to the form.
 8   And at this point in time, I understand that
 9   her -- the information or opinion she has about
10   the legal meaning of "clinical staff" would be
11   inseparable from numerous communications she's
12   had of a privileged nature with her attorney
13   because that has been the subject of so many
14   communications, so I'm going to instruct her not
15   to answer that.
16            MR. WESTLING:  Just for purposes of
17   the record -- and we can talk about that off, if
18   that's more appropriate -- in light of the
19   number of objections particularly based --
20   concerned about privilege, I'm just kind of
21   letting you know that I'll probably ask to keep
22   the deposition open at the end of the day, in
23   the event that I need to seek any kind of
24   evaluation of that --
25            MR. PIGOTT:  Okay.
```

*The Court's resolution*: In as much as the Q and A leading up to this answer and objection was not provided to the Court, I am without sufficient information to find this testimony inadequate or improper.

In addition to the foregoing, I find that the motion is due to be denied, as it was filed on the last day of discovery. Thus, the motion fails to comply with Local Rule 7(b)(2)(C) recited above.

For all of the above reasons, the motion to compel [Doc. 77] is **DENIED**.

**SO ORDERED**, this the 19th day of February, 2026.

/s/ Jane M. Virden
**UNITED STATES MAGISTRATE JUDGE**